**[J-62-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 62 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 62 EDA 2023 |
| | : | entered on February 16, 2024, |
| v. | : | affirming the Order of the |
| | : | Philadelphia County Court of |
| | : | Common Pleas at No. MC-51-CR- |
| QUADIR STEADLY, | : | 0016266-2021, entered on |
| | : | November 28, 2022 |
| Appellant | : | |
| | : | ARGUED:  September 9, 2025 |

**OPINION**

**JUSTICE DONOHUE**                                   **DECIDED: July 21, 2026**

Philadelphia Police Officer Corey Moore lawfully stopped Quadir Steadly for a minor Motor Vehicle Code violation, during which Officer Moore attempted to arrest Steadly after learning from a dispatcher that two bench warrants had been issued in Steadly's name.  To effectuate the arrest, Officer Moore required assistance from several additional officers to overcome Steadly's resistance.  Consequently, the Commonwealth charged Steadly with, inter alia, resisting arrest, a violation of Section 5104 of the Crimes Code.[1]  Steadly was convicted of that offense, and the Superior Court affirmed his judgment of sentence.

---

[1]  "A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a **lawful arrest** or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance."  18 Pa.C.S. § 5104 (emphasis added).

We granted review to decide whether there was sufficient evidence to prove the lawful arrest element of Section 5104 where the Commonwealth produced neither the purported bench warrants nor any evidence of their validity. After careful review, we hold that when an arrest is justified solely on the basis of a warrant, the Commonwealth must produce evidence of the validity of the warrant beyond an officer's second-hand knowledge of its existence to prove the arrest was lawful.

**Background**

The Commonwealth charged Steadly with recklessly endangering another person ("REAP") and resisting arrest.[2] At a bench trial held in Philadelphia Municipal Court, the Commonwealth presented Officer Moore's testimony and bodycam footage of the incident. Steadly testified in his own defense and presented unrebutted character evidence by stipulation. The evidence adduced at trial was as follows.

Officer Moore testified that at approximately 7:15 p.m. on August 30, 2021, he pulled Steadly over because of an illegally tinted windshield.[3] N.T., 4/1/2022, at 10. Steadly was unable to provide Officer Moore with his license, registration, or proof of insurance, but instead verbally provided the officer with identity information. *Id.* at 11. Officer Moore returned to his police cruiser to enter that information into his Mobile Data Terminal ("MDT"), from which the officer learned that there were two bench warrants that had been issued in Steadly's name. *Id.* at 12.

Steadly's counsel lodged a best-evidence objection to Officer Moore's testimony regarding the content of the MDT database.[4] *Id.* at 12-13. The court sustained the

---

[2] 18 Pa.C.S. §§ 2705, 5104.

[3] *See* 75 Pa.C.S. § 4524(E). The Commonwealth never charged Steadly with a violation of Section 4524.

[4] "An original writing, recording, or photograph is required in order to prove its content unless these rules, other rules prescribed by the Supreme Court, or a statute provides otherwise." Pa.R.E. 1002.

objection insofar as the testimony was being offered to prove the existence or validity of the warrants. *Id.* at 13. However, the court overruled the objection to the extent that it was offered to show why Officer Moore decided to arrest Steadly.[5] *Id.* Officer Moore then testified that he also received confirmation from a police dispatcher that the bench warrants were active, explaining that he contacted the dispatcher because he never relies on the MDT database for such information.[6] *Id.* at 14, 26. Steadly's counsel did not object to Officer Moore's testimony about the confirmation he received from the dispatcher.

After receiving the confirmation, Officer Moore returned to Steadly and told him to turn off and exit the car, but Steadly refused, prompting Officer Moore to open the door and attempt to remove Steadly from the vehicle. *Id.* at 14-15. A struggle ensued, during which Steadly dislodged Officer Moore's body camera and elbowed him in the face, although Officer Moore testified that he was not harmed.[7] *Id.* at 15-16, 22. Officer Moore and his partner removed Steadly from the vehicle, and with the help of multiple backup officers, they ultimately subdued him after struggling to do so for approximately one to two minutes. *Id.* at 16-18.

---

[5] In response to Steadly's best-evidence objection, the prosecutor specifically agreed with the court that the testimony regarding the MDT database had not been offered to prove the existence or validity of the bench warrants. N.T., 4/1/2022, at 13.

[6] Officer Moore testified that the dispatcher told him that Steadly "ha[d] two active bench warrants." N.T., 4/1/2022, at 22. No evidence was provided regarding the source of the dispatcher's information or whether it provided more accurate or up to date information than what was available to Officer Moore. The record simply demonstrates that Officer Moore appeared to trust the dispatcher more than the information he personally read from the MDT database.

[7] We declined to review Steadly's claim that the Commonwealth's evidence was insufficient to show that his conduct created a "substantial risk of bodily injury" or had that he had employed "means justifying or requiring substantial force to overcome the resistance." 18 Pa.C.S. § 5104. We assume for purposes of this opinion that Steadly's physical resistance was sufficient to meet those elements of resisting arrest.

Officer Moore authenticated his bodycam footage, which generally corroborated his testimony. *Id.* at 20. The video shows Officer Moore returning to his cruiser following his initial interaction with Steadly and his subsequent use of the MDT.[8] After examining the MDT database, Officer Moore contacted dispatch, and the dispatcher can be heard replying that Steadly had "two of them," ostensibly referring to two warrants. The video then shows Officer Moore returning to Steadly's vehicle. As Steadly was forcibly extracted, Officer Moore's body camera became dislodged and the video cuts to black. For approximately thirty seconds thereafter, the audio feed from the bodycam footage captures the sound of the struggle.[9]

Giving rise to the issue before us today, Officer Moore never provided testimony regarding the existence or validity of the bench warrants beyond the confirmation he received from dispatch. He specifically indicated that he had no idea what the warrants were for. *Id.* at 28. Officer Moore testified that he did not observe Steadly commit an arrestable offense and that the only reason he arrested him was because of the warrants. *Id.* at 37.

At the conclusion of the bench trial, the Municipal Court acquitted Steadly of REAP but convicted him of resisting arrest. *Id.* at 47-48. The court sentenced him to an aggregate term of six months of probation. N.T., 4/1/2022, at 49.

Steadly timely filed a petition for writ of certiorari in the Philadelphia County Court of Common Pleas ("CCP") challenging the sufficiency of the evidence based upon the Commonwealth's failure to establish the validity of the underlying bench warrants and the

---

[8] While the MDT screen is visible in the bodycam footage, the text on the display is not.

[9] Over Steadly's objection, the Commonwealth also produced a one-minute-long video from an unidentified officer's body camera that shows his arrival on the scene as the struggle between Officer Moore and Steadly was already underway. The second video confirms that at least four officers were required to subdue Steadly.

ostensibly minimal force Steadly used to resist arrest. The CCP denied the writ and affirmed the Municipal Court's decision. N.T., 11/28/2022, at 4-6. In its Pa.R.A.P. 1925(a) opinion, the CCP determined that, "under the totality of the circumstances, Officer Moore's reliance on the MDT search and radio dispatch provided him with probable cause to effectuate a lawful arrest of Steadly." CCP Opinion, 4/13/2024, at 6. In doing so, the court relied on a series of Superior Court cases, culminating with *Commonwealth v. Heidelberg*, 267 A.3d 492 (Pa. Super. 2021) (en banc), that apply a preponderance of evidence standard to determine whether an arrest is valid for purpose of applying the exclusionary rule at a suppression hearing.[10] *Id.*

The Superior Court affirmed. *Commonwealth v. Steadly*, 2024 WL 660331, at *5 (Pa. Super. 2024). Relying on its prior decisions in *Commonwealth v. Bailey*, 947 A.2d 808, 811 (Pa. Super. 2008), and *Commonwealth v. Blakney*, 396 A.2d 5, 7 (Pa. Super. 1978), the Superior Court determined that because Officer Moore possessed probable cause that warrants existed based on the information in the MDT database[11] and the confirmation he received from dispatch, the arrest was lawful for sufficiency purposes under the resisting arrest statute. *Steadly*, 2024 WL 660331, at *3-*4. The Superior Court did not rely on or cite *Heidelberg*.

---

[10] *Heidelberg* involved an arrest premised solely on the arresting officers' discovery of an outstanding warrant in a police database and considered whether to apply the exclusionary rule at a suppression hearing under a preponderance of the evidence standard. *See Heidelberg*, 267 A.3d at 501-02 (concluding that the Commonwealth "met its burden of proving by a preponderance of the evidence that a valid arrest warrant for Appellant existed" because "under the totality of the circumstances," it was "more probable than not that a valid warrant existed" where two officers testified that dispatch had confirmed the existence but where the Commonwealth did not produce the warrant at the suppression hearing).

[11] The Superior Court did not address why it considered the information in the MDT database given that Officer's Moore's testimony regarding that information was limited by Steadly's best-evidence objection.

**Issue**

We granted review of one question that we rephrased as follows:

> Where the sole basis for an arrest is a warrant, is the evidence insufficient to establish resisting arrest when the Commonwealth failed to produce evidence of the warrant's validity?

*Commonwealth v. Steadly*, 328 A.3d 1 (Pa. 2024) (per curiam).

**Parties' Arguments**

Steadly asserts that for purposes of proving the lawful arrest element of resisting arrest, "it is the validity of the warrant which renders an arrest lawful; not the officer's belief that a warrant may exist, or even the existence of a document titled 'warrant.'" Steadly's Brief at 7. He asserts that because the Commonwealth "failed to produce any evidence of a warrant" to arrest him "beyond the statement of an individual over police radio indicating that bench warrants existed[,]" the evidence was insufficient to sustain a conviction for resisting arrest. *Id.* at 8.

Steadly first notes that it is undisputed that a lawful arrest is an element of the crime of resisting arrest. *Id.* at 8-9 (citing *Commonwealth v. Jackson*, 924 A.2d 618, 620 (Pa. 2007) ("[T]o be convicted of resisting arrest, the underlying arrest must be lawful.")). He further acknowledges that the lawfulness of an arrest is generally a legal determination regarding whether there exists probable cause and authority to arrest. *Id.* at 9 (citing *Commonwealth v. Biagini*, 655 A.2d 492, 497 (Pa. 1995)). However, Steadly asserts that an arrest "is categorically illegal when based upon an invalid arrest warrant regardless of the officer's belief in its validity." *Id.* Thus, he argues that the Commonwealth must establish the validity of a warrant to satisfy the lawful arrest element of resisting arrest at trial, emphasizing that the "burden cannot be shifted to a defendant to disprove its validity." *Id.* at 10.

Steadly argues that it is not the mere existence of a warrant, but its validity, that determines whether an arrest is lawful, citing Pennsylvania authorities that have

"consistently held that arrests pursuant to warrants lacking in probable cause are illegal." *Id.* at 11 (citing *Commonwealth v. Wagner*, 406 A.2d 1026 (Pa. 1979); *Commonwealth v. Laventure*, 894 A.2d 109 (Pa. 2006)). He maintains that warrant entries can remain in police databases even "after they have been recalled, expired or previously served." *Id.* (citing *Herring v. United States*, 555 U.S. 135 (2009) (recalled warrant); *Commonwealth v. Johnson*, 86 A.3d 182 (Pa. 2014) (previously served warrant); *Commonwealth v. Smith*, 995 A.2d 1143 (Pa. 2010) (expired warrant)). Steadly asserts that a common thread running through *Herring*, *Johnson*, and *Smith* is that, in each case, a court was able to evaluate the lawfulness of the arrest because the defective warrants were presented in court. *Id.* at 12. He argues that the Commonwealth must establish that bench warrants entered into a police database "were correctly entered, current, and based upon probable cause" to establish that an arrest conducted pursuant to such warrants are lawful.[12] *Id.* at 13.

Regardless of the context in which a bench warrant is issued, Steadly contends it is only valid if it is supported by probable cause to believe that the criteria for issuing the warrant are met. *Id.* at 15-16. Because the Commonwealth never presented the warrants at trial in this case, he argues that the record cannot support the conclusion that Steadly "acted in a manner justifying the issuance of a bench warrant[,]" whether the warrants "were associated with a criminal, summary, or civil case," nor whether "any warrant was current and valid at the time of Mr. Steadly's detention." *Id.* at 16. He maintains that

---

[12] Steadly also contends that in some circumstances, the existence of a bench warrant itself does not compel an officer to effectuate an arrest. For instance, in summary cases, bench warrants may be issued where a defendant has failed to appear for a summary trial, or failed to pay fines, costs, and/or restitution. Steadly's Brief at 15 (citing Pa.R.Crim.P. 430(B)). In such cases, a police officer is directed to accept payment for such fines, costs, and/or restitution (or collateral if the defendant pleads not guilty) if listed on the warrant, and is only instructed to execute an arrest if "the defendant is unable to pay[.]" Pa.R.Crim.P. 431(C)(1)(a)-(d).

evidence that a warrant was once entered into a police database cannot substitute for evidence of its current validity and, absent more, cannot satisfy the lawful arrest element. *Id.* at 17.

Steadly further contends that the Superior Court misapplied the collective knowledge doctrine in a manner that effectively imported the good faith exception sub silentio. He admits that the lower courts correctly stated the law insofar as 1) "an officer may rely upon information received over the radio in executing an arrest[,]" 2) "bench warrants are issued when a defendant fails to appear in court[,]" and 3) "the arresting officer need not have the warrant in hand in order for the arrest to be valid." *Id.* However, while those legal principles are individually sound, he asserts that the lower courts "omitted a crucial element: the information or warrant relied upon by the officer must be valid and must establish probable cause to arrest[.]" *Id.* at 18 (citing *Whiteley v. Warden*, 401 U.S. 560 (1971); *Commonwealth v. Yong*, 177 A.3d 876 (Pa. 2018); *Commonwealth v. Queen*, 639 A.2d 443 (Pa. 1994)). Steadly maintains that this Court's precedent establishes that an "arrest will be found lawful so long as the Commonwealth can produce evidence in court to show that the information upon which it relied established probable cause to arrest." *Id.* (citing *Yong*, 177 A.3d at 885). He contends that if the Commonwealth fails to make such a showing, it has failed to prove a lawful arrest. *Id.*

Steadly argues that *Bailey*, a suppression case upon with the Superior Court relied, is inapposite as it did not address the Commonwealth's burden to establish probable cause at a trial. *Id.* at 19. He asserts that *Bailey* held only that the arresting officer was permitted to rely on a police bulletin at the time of the arrest but that the Commonwealth subsequently justified that reliance by producing the warrant and evidence of its validity in court at suppression. *Id.* at 19. According to Steadly, both *Queen* and *Yong* stand for the same proposition—that the collective knowledge doctrine permits arrests by officers

who do not themselves possess knowledge of the facts that establish probable cause and that any such arrest is only deemed legal if the government subsequently meets its probable cause burden in court. *Id.*

Steadly contends that the

> error made by the lower court in *Queen* mirrors the one made by the lower court in this case. Without either seeing the warrant or hearing testimony from the officer who relayed information to Officer Moore, it assumed that the information was correct. Without any evidence about the warrant, it assumed that a valid and current warrant existed which established probable cause.

Steadly's Brief at 20. Steadly maintains that this case also mirrors *Whiteley*, the case that first formulated the collective knowledge doctrine, observing that the High Court held in that case that Whiteley's arrest was unconstitutional despite the fact that "the officer was justified in acting upon the information in the police bulletin," because "the underlying warrant did not support a finding of probable cause." *Id.* at 21 (citing *Whiteley*, 401 U.S. at 563).

Steadly contends that the Superior Court has slowly deviated from this standard over time, culminating in *Commonwealth v. Bumbarger*, 231 A.3d 10 (Pa. Super. 2020),[13] wherein the court found an arrest to be lawful based only on evidence that the National Crime Information Center ("NCIC") database listed an active warrant at the time of the arrest, relying on its own precedent that had deemed NCIC information to be "inherently reliable."[14] *Id.* at 22-23 (citing *Bumbarger*, 231 A.3d at 15-16). Steadly maintains that the Superior Court's precedent is now so "blatantly in conflict with this Court's and the United States Supreme Court's development of the collective knowledge doctrine that it must be

---

[13] Heidelberg substantially relied on *Bumbarger*. *See Heidelberg*, 267 A.3d 499-501.

[14] Because it concluded that the arresting officer was permitted to rely on an NCIC report for probable cause to stop and arrest Bumbarger, the *Bumbarger* Court never examined whether the warrant was valid.

reversed." *Id.* at 23. He argues that "[n]o matter how reasonably an officer acted in relying upon information from a fellow officer—even in relying upon information indicating the existence of a warrant—the legality of an arrest pursuant to a warrant turns upon the validity of the warrant itself." *Id.*

Steadly maintains that the Superior Court has not only upended the collective knowledge doctrine, but it has also allowed the federal good faith exception to the warrant requirement to come in through the back door in violation of this Court's precedent in *Johnson*, 86 A.3d at 182. He agrees that "police may rely upon this information in the field because they have to rely on their good faith beliefs in information provided to them in the moment." Steadly's Brief at 24. However, while "good faith acts as an exception to the federal exclusionary rule[,]" it "only comes into play … if there is a constitutional violation[,]" and it does not transform assumed probable cause during an arrest "into actual probable cause" when reviewed by a court. *Id.* at 24-25. Steadly argues that the Commonwealth must produce evidence establishing the validity of the warrant in court when a police officer relies on others for the establishment of probable cause in the field. *Id.* at 25 (citing *Queen*, 639 A.2d at 445). Because the Commonwealth must establish the lawfulness of the arrest, Steadly contends that he had no burden to establish the warrants' invalidity. *Id.* (citing *Commonwealth v. Bishop*, 372 A.2d 794, 796 (Pa. 1977) (stating "the burden of proof in establishing guilt rests with the Commonwealth")).

Turning to the evidence in this case, Steadly argues that "a statement from an officer over police radio indicating that bench warrants were in place" is no substitute for the warrants themselves and left the court unable to determine their validity. *Id.* at 26. Steadly maintains that permitting such a presumption requires adoption of the logic explicitly rejected in *Queen*. *Id.* Thus, Steadly asks us to hold that when "an arrest is

based upon a warrant, unless the Commonwealth produces evidence which establishes the warrant's validity, it fails to establish the lawfulness of the arrest." *Id.*

The Commonwealth maintains that the lawfulness of an arrest for purposes of the resisting arrest statute is a legal question "for the judge, not the jury[.]" Commonwealth's Brief at 8-9 (citing *Biagini*, 655 A.2d at 497). It acknowledges that proof of the lawfulness of an arrest for purposes of resisting arrest requires proof that it is supported by probable cause, even in the context of a sufficiency challenge. *Id.* at 9 (citing *Commonwealth v. Hock*, 728 A.2d 943, 946 (Pa. 1999)). It emphasizes, however, that probable cause requires only a probability of criminal activity, which it equates to a preponderance of the evidence standard. *Id.* at 10 (citing *Commonwealth v. DeWitt*, 608 A.2d 1031, 1032 (Pa. 1992)). From these premises, the Commonwealth argues that when a defendant is arrested on a warrant, "the inquiry on appellate review is whether the lower court properly exercised its discretion in determining that 'it was more probable than not that a valid warrant existed from the evidence adduced.'" *Id.* (quoting *Heidelberg*, 267 A.3d at 501) (emphasis omitted). Accordingly, the Commonwealth contends that the question involves the "totality of the circumstances" and that "whether or not the actual warrant itself is presented to the court is not dispositive." *Id.*

The Commonwealth avers that Officer Moore "possessed the requisite probable cause to arrest" Steadly based on his learning that Steadly "had two active bench warrants" listed in the MDT database that were "verified" by a dispatcher. *Id.* at 11.[15] It further argues that probable cause was supported by the fact that Steadly was operating a car "with an illegal tint, was unable to provide his driver's license, and ignored repeat[ed] commands to shut his vehicle off." *Id.* at 12. The Commonwealth maintains that under

---

[15] Like the Superior Court, the Commonwealth ignores the evidentiary ruling that limited Officer Moore's testimony about his own observations.

"the totality of these facts, the arrest was proper." *Id.* (citing *Commonwealth v. Johnsonna*, 616 A.2d 1376, 1378 (Pa. Super. 1992)).[16]

The Commonwealth contends that an officer's "personal knowledge" that an "individual is wanted on a bench warrant" constitutes probable cause to effectuate an arrest. *Id.* at 12. In that regard, the Commonwealth cites our plurality opinion in *Commonwealth v. Gwynn*, 723 A.2d 143 (Pa. 1998) (plurality). In *Gwynn*, the plurality stated that probable cause to arrest was established after police discovered that Gwynn had outstanding bench warrants following his detention on reasonable suspicion of his involvement in a burglary.[17] The Commonwealth maintains that this means that it was "the **knowledge of the bench warrants** that created probable cause to arrest." Commonwealth's Brief at 13 (emphasis in original). The Commonwealth maintains that this is consistent with Superior Court case law that holds that a police officer "need not physically possess the actual warrant itself to perform an arrest." *Id.* (citing *Blakney*, 396 A.2d at 7).

---

[16] In *Johnsonna*, the Superior Court considered the legality of an arrest of Olverson, because it had led directly to Johnsonna's arrest. Because "the Commonwealth presented no evidence that the alleged bench warrant" for Olverson "was in effect at the time of the incident and arrest[,]" the court "analyze[d]" the "situation from the standpoint of a warrantless arrest." *Johnsonna*, 616 A.2d at 1378. However, the arresting officer was "clearly aware of Olverson's identity since he was the arresting officer on a previous charge (less than three weeks prior) and was present at the time a bench warrant was issued for her failure to appear." *Id. Johnsonna* held that the officer's direct knowledge of the circumstances giving rise to the warrant, coupled with Olverson's flight, collectively supported probable cause.

[17] The Commonwealth asserts that Gwynn had challenged the legality of his arrest, but the focus in *Gwynn* was on whether police had unlawfully detained him before they discovered his outstanding warrants, and the plurality never explicitly said that probable cause was established solely on the basis of the outstanding warrants. Regardless of whether the outstanding warrants independently and solely provided probable cause to arrest or whether the *Gwynn* plurality used that fact among many other to conclude that probable cause existed for the burglary under investigation, there is nothing in *Gwynn* indicating that the validity of those outstanding warrants had been challenged. For that reason, and because *Gwynn* was a plurality opinion, we will not address it further.

The Commonwealth further contends that arrest warrants and bench warrants are "fundamentally different." *Id.* A bench warrant "orders … law enforcement officers to take the subject of the warrant into custody." *Id.* (citing Pa.R.Crim.P. 150(A)). The Commonwealth argues that a

> bench warrant often contains limited information and is always issued for one reason: an individual who was required to appear in court did not do so. Absent exceptional circumstances, therefore, a bench warrant will be valid on its face. Thus, in the probable cause calculus, the officer with knowledge of a warrant has little discretion in questioning whether an individual should be arrested. To the contrary, a bench warrant **compels** the officer to take the subject into custody so that he may be brought before the court.

*Id.* at 13-14 (emphasis in original).[18]

Next, the Commonwealth contends that an "arrest is not per se illegal simply because the Commonwealth does not produce the warrant that prompted the arrest." *Id.* at 14. It acknowledges that Steadly is claiming that because the Commonwealth did not produce the alleged bench warrants, "the evidence could not have allowed the trial court to determine that the arrest was lawful" but contends that the Superior Court resolved a "near-identical claim" in *Commonwealth v. Cotton*, 740 A.2d 258 (Pa. Super. 1999). Commonwealth's Brief at 14. The Commonwealth avers that in *Cotton*, the court determined that an officer "had probable cause to arrest based on viewing the warrants in the NCIC report alone[.]"[19] *Id.* at 15 (citing *Cotton*, 740 A.2d at 265). It also cites *Commonwealth v. Galendez*, 27 A.3d 1042, 1047 (Pa. Super. 2011), where the Superior

---

[18] The Commonwealth fails to explain how arrest warrants are distinguishable since they also authorize an arrest regardless of whether the arresting officer knows the details that led to a finding of probable cause.

[19] Officer Moore, the Commonwealth's sole witness, made no mention of the NCIC database or an NCIC report, and no NCIC report was admitted into evidence. In fact, the only mention of an NCIC report in the trial court was by defense counsel who emphasized the absence of an NCIC report in his closing argument. *See* N.T., 4/1/2022, at 42.

Court determined that an officer's testimony was alone sufficient to prove the validity of the outstanding warrant."[20]  *Id.* (citing *Galendez*, 27 A.3d at 1047).

The Commonwealth concedes that there are times when the Commonwealth will fail to meet its burden of proving a lawful arrest without producing a warrant in court, such as when the arresting officer has no direct knowledge of the existence of a warrant. Commonwealth's Brief at 15-16 (citing *Commonwealth v. Easter*, 331 A.3d 675 (Pa. Super. 2025)).  In *Easter*, the Superior Court held that the Commonwealth failed to prove the existence of a warrant where no witness testified to "first-hand knowledge" that it existed. [21]  *Easter*, 331 A.3d at 681.  In that case, the only evidence of the arrest warrant was the testimony of the arresting officer, who stated that he "believed" a warrant had been issued, but he also testified that the database in which he discovered the warrant was "inaccessible … once service was made."  *Id.* at 678.  Here, the Commonwealth maintains, "Officer Moore **did** have first-hand knowledge that the warrants existed: He not only viewed police records indicating their existence in his cruiser laptop, but he in

---

[20]  The Commonwealth omits that *Galendez* reaffirmed that the Commonwealth must prove the validity of a warrant, even as it allowed for proof of validity in the absence of the warrant.  It further overlooks that the Superior Court specifically noted that "Galendez failed to argue that there was no valid warrant for his arrest or that he was not wanted by the police[,]" which was critically important because Galendez was concerned with suppression, not sufficiency, and so Galendez was required to put those issues into play via his suppression motion.  *Galendez*, 27 A.3d at 1047.  Thus, in *Galendez*, the Superior Court was confronted only with the claim that the failure to present the warrant at suppression precluded a finding of probable cause in all circumstances, a claim it easily rejected under the circumstances of that case.

[21]  The *Easter* Court suggested that the Commonwealth's burden could have been met had it shown: "documentary evidence or testimony regarding the issuance of the underlying citation," "the physical arrest warrant," testimony of a witness with first-hand knowledge of the existence of the arrest warrant," "records from a reliable database demonstrating the existence and issuance of the arrest warrant," or "evidence of the return of service of the arrest warrant[.]"  *Easter*, 331 A.3d at 681.

fact verified their active status with a radio dispatcher before deciding to place defendant under arrest." Commonwealth's Brief at 16 (emphasis in original).

The Commonwealth contends that Steadly's reliance on cases expressing Pennsylvania's departure from the federal good faith exception are "unpersuasive" because none of those cases "held that to establish a lawful arrest, the Commonwealth must **always** introduce the underlying warrant at a hearing (or trial) or the arrest is categorically illegal." *Id.* at 16-17 (emphasis in original). The Commonwealth argues that those cases only concerned whether suppression is warranted due "to a defective search or arrest warrant" and maintains that whether the "warrants had later been discovered to be invalid" is an "irrelevant inquiry" when considering whether an arrest itself was lawful or unlawful. *Id.*

Furthermore, the Commonwealth argues that under Steadly's proposed standard, production of the warrant would not have been sufficient to prove a lawful arrest, because warrants are not "live document[s] that [are] updated once served, expired, or rescinded; they are simply a paper order signed by a judge." *Id.* at 18. The Commonwealth proposes that absent "evidence or allegation" of "rampant error in bench warrant records" in Philadelphia police databases, "the court was allowed to rely on the testimony and video evidence" that it was "more probable than not" that a valid warrant existed. *Id.* (citing *Heidelberg*, 267 A.3d at 501).

The Commonwealth also argues that requiring it to prove—"in the absence of notice or specific allegation—that an arrest was not only lawful … but could not have **possibly** been **unlawful** is unworkable." *Id.* at 19 (emphasis in original). It observes that when seeking suppression, a defendant must file a pre-trial motion alleging a constitutional violation, which must state with specificity and particularity "the evidence sought to be suppressed, the grounds for suppression, and the facts and events in

support thereof." *Id.* (quoting Pa.R.Crim.P. 581(D)). Only then is a burden assigned to the Commonwealth to prove "that the evidence was not obtained in violation of the defendant's constitutional rights[.]" *Id.* (citing Pa.R.Crim.P. 581(H)). The Commonwealth contends that the same logic should apply here, and that the Commonwealth cannot establish specific facts when it has no notice that it is expected to prove (or disprove) those facts—or even that those facts are in dispute." *Id.* at 20. Moreover, it argues that for purposes of sufficiency review, the Commonwealth need not "preclude every possibility of innocence." *Id.* (quoting *Commonwealth v. Hill*, 210 A.3d 1104, 1112 (Pa. Super. 2019)).

Finally, the Commonwealth contends that the evidence adduced at trial satisfies the sufficiency standard because "there was no indication or suggestion that the warrants had actually been recalled or rescinded, that they were previously served, that the judge who issued them did so without probable cause, or that they were otherwise invalid." *Id.* at 21. It argues that Steadly's speculations about the warrants' invalidity "is immaterial to sufficiency review." *Id.* at 21. The Commonwealth insists that Officer Moore was "justified" in placing Steadly under arrest and that it "would have been neglect of his duty" to not arrest him. *Id.*

In his reply brief, Steadly argues that the Commonwealth's logic is erroneous at its foundation because it conflates the Commonwealth's burden at trial with its burden at suppression. Steadly's Reply Brief at 1. This is because due process demands proof of any element of any crime beyond a reasonable doubt at trial, whereas at suppression, a lesser, preponderance of the evidence standard controls. *Id.* (citing *Jackson*, 924 A.2d at 620). He maintains that there is no discrepancy in finding an arrest to be lawful for suppression purposes but not for sufficiency purposes, just as there is no incongruity in a defendant prevailing at trial despite failing to successfully litigate pre-trial motions,

observing that we "impose a higher standard of proof at trial because its outcome is dispositive of the defendant's ultimate liberty interests." *Id.* at 7.

Steadly also contends that the "lawful arrest" element is not a pure question of law but instead involves mixed questions of law and fact that are not entirely beyond a jury's purview. *Id.* at 1-2, 8. He contends that sufficient proof of a lawful arrest in the context of the resisting arrest statute involves factual proof of the existence of a warrant when the arrest is premised solely on the warrant. *Id.* at 8. He insists that the existence of probable cause, a pure legal question, is a necessary—but when alone insufficient—component of "lawfulness." *Id.* at 2.

Steadly assails the Superior Court's line of cases that construe the lawful arrest element of resisting arrest as a pure legal question. *Id.* In his view, the court conflates the burdens required to prevail in different procedural postures during criminal proceedings. *Id.* at 9-10 (distinguishing motions practice on evidentiary questions from proof of guilt at trial). Regardless, Steadly argues that in both contexts, the lawfulness of an arrest "involves mixed questions of fact and law" and that the assumption that the lawfulness of an arrest is a pure question of law is belied by the fact that a jury is tasked with determining the lawfulness of a detention for the tort of false imprisonment. *Id.* He notes that Pennsylvania's suggested civil jury instructions set forth multiple definitions of probable cause to provide to a jury in that context. *Id.* at 10-11 (citing Pa. SSJI (Civ), §17.50 (2024)).

Steadly denies that he is arguing that an arrest is per se unlawful if the prosecution fails to produce a warrant. *Id.* at 14. He instead maintains that "to establish that an arrest based on a warrant was lawful, the Commonwealth must establish the validity of the warrant which establishes the constitutional basis for the arrest." *Id.* Steadly posits that the Commonwealth could prove the lawfulness of a bench warrant by presenting a

witness with sufficient personal knowledge to establish a warrant's validity or through a properly admitted NCIC report. *Id.* at 14-15. In the case of an arrest warrant, he suggests "the officer who submitted the affidavit of probable cause for the warrant could be called to testify[.]" *Id.* at 15. Steadly further asserts that, as a practical matter, the validity of a warrant will often be uncontested and the lawful arrest element will be met by stipulation. *Id.* at 16. Steadly observes that the Commonwealth "did none of those things." *Id.*

Steadly also disputes that Officer Moore had "first-hand knowledge" of the warrant as his account of what the MDT database said and/or what was conveyed to Officer Moore by the dispatcher were hearsay statements that established, at best, the officer's second-hand knowledge of the existence of a warrant. *Id.* at 14 n.4. Steadly maintains that the evidence presented was insufficient because "it merely suggests that some database indicates that a warrant was issued while saying nothing about its timing, supporting probable cause, or validity." *Id.* at 17. Steadly reiterates that "where an arrest is based solely upon a warrant, it must be a valid warrant establishing probable cause" and that an "arrest is not rendered valid simply because an officer has probable cause to believe a warrant exists." *Id.* And while "the easiest way" for the Commonwealth to meet its burden at trial may be through a proffer of a certified copy of the warrant, that "does not mean it is the only way." *Id.* at 17.

Regarding the Commonwealth's complaint that, for suppression purposes, a defendant must give notice of the nature of a challenge to a warrant, Steadly maintains that a defendant generally has no burden "to give notice of his theory of the case or what elements he will contest." *Id.* at 18. The Rules of Criminal Procedure only require a defendant to provide notice of a few, specifically delineated defenses. *See* Pa.R.Crim.P. 567 (alibi); 568 (insanity or mental infirmity). Beyond that, Steadly argues, "the

Commonwealth is on notice from the simple existence of the statute that it must establish every element of every offense at trial."[22]  Steadly's Reply Brief at 18.

Finally, Steadly avers that the Commonwealth simply exaggerates the burden to show a warrant's validity to excuse the minimal effort it put forth in this case, stating that, here,

> the Commonwealth established [only] that warrants in an unknown case had, at some time been entered into the police computer.  Merely establishing the existence of a warrant does not meet its burden. Surely the Commonwealth, responsible for handling complex prosecutions on a daily basis, can evaluate what is needed to establish the validity of a given warrant.

*Id.* at 19.

**Analysis**

We granted review to determine whether the Commonwealth must produce evidence of a warrant's validity to establish the lawful arrest element of resisting arrest in circumstances where a warrant is the sole basis for arrest.  This claim implicates the sufficiency of evidence to sustain a conviction.  Sufficiency challenges are questions of law and as such, our standard of review is de novo.  *Commonwealth v. Rushing*, 99 A.3d 416, 420 (Pa. 2014).[23]  Our scope of review considers "the evidence of record, and all reasonable inferences arising therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner."  *Id.* at 420-21.

---

[22]  Steadly also argues that "the very specific elements of resisting arrest provide a limit to the Commonwealth's burden and notice of the constitutional issues that may arise" because whereas a motion to suppress may involve challenges to "the initial stop, the seizure of a person or of items, the search of a car or house, a frisk or search of a person, etc.[,]" the lawfulness of the arrest" is the only issue "in a trial for resisting arrest." Steadly's Reply Brief at 18 n.6.

[23]  As is also relevant in this matter, "the ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed de novo."  *Ornelas v. United States*, 517 U.S. 690, 691 (1996) (italics omitted).

Pennsylvania's resisting arrest statute became effective in 1973 and is derived directly from the Model Penal Code.[24]  18 Pa.C.S. § 5104, cmt.; *see also Commonwealth v. Crosby*, 329 A.3d 1141, 1144 (Pa. 2025).  It provides:

### § 5104. Resisting arrest or other law enforcement

A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

18 Pa.C.S. § 5104.

On the first occasion in which this Court discussed Section 5104 after its adoption, we highlighted the legislature's use of the term "lawful arrest."  *See Glass v. Com., Dept. of Transp., Bureau of Traffic Safety*, 333 A.2d 768 (Pa. 1975).  In *Glass*, the appellant argued that the General Assembly's use of the term "arrest" in a provision of the Motor Vehicle Code "encompasses more than a factual determination that there has been a deprivation of a person's liberty[] but also requires a legal determination that the restraint of personal freedom was exercised in accordance with law."  *Id.* at 770.  We disagreed, stating than when "the legislature intended to require a determination of the lawfulness of the arrest procedure," it used the term "lawful arrest" as it had done in the resisting arrest statute.  *Id.* (citing 18 Pa.C.S. § 5104).

That core interpretation of the lawful arrest element was first tested in *Commonwealth v. Karl*, 476 A.2d 908 (Pa. Super. 1984).  There, the Superior Court recognized the "clearly disjunctive" formulation of Section 5104, as it applies when an officer is effectuating a "lawful arrest or discharging any other duty."  *Karl*, 476 A.2d at

---

[24]  *See* Model Penal Code § 242.2 ("A person commits a misdemeanor if, for the purpose of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.").

911. The court rejected the argument that the "discharging any other duty" language of Section 5104 could effectively swallow the "lawful arrest" language. *Id.* ("If we accept the argument of the Commonwealth, … the statute would be interpreted to allow every resisting arrest charge to stand whether or not supported by a lawful arrest. The police would undoubtedly argue in every case where there was an unlawful arrest that they were merely discharging a duty[.]").

*Biagini* was the first time in which we addressed what constitutes sufficient evidence of the lawful arrest element of resisting arrest in our review of two underlying cases.[25] *Biagini*, 655 A.2d 492. In Biagini's case, the Superior Court overruled the trial court in concluding that Biagini's arrest was unlawful for lack of probable cause but nonetheless held that the legality of his arrest was "irrelevant to the conviction for resisting arrest." *Biagini*, 655 A.2d at 493. Police lacked probable cause to arrest Biagini for public drunkenness because Biagini, although belligerent and obviously drunk, was "in his home and on his porch," and therefore not in a public place as required under the public drunkenness statute, 18 Pa.C.S. § 5505. *Biagini*, 655 A.2d at 494. The Superior Court determined that although probable cause was lacking to arrest Biagini, the resistance was not justified because the officer was performing his duty—a holding that closely resembled what the Superior Court had previously rejected in *Karl*. *Id.* at 495.

*Biagini* also considered the Superior Court's conflicting en banc holding in *Barry W.* Barry W. was arrested after he fled from police. *Id.* at 495-96. The Superior Court determined that police lacked both probable cause to arrest and reasonable suspicion to justify a *Terry*[26] stop. *Id.* at 496. However, at odds with what it had done in Biagini's

---

[25] *Commonwealth v. Biagini*, 640 PGH 92, 428 Pa. Super. 634 (Pa. Super. Feb. 18, 1993) (non-precedential decision); *In Interest of Barry W.*, 621 A.2d 669 (Pa. Super. 1993) (en banc).

[26] *See Terry v. Ohio*, 392 U.S. 1 (1968).

case, the Superior Court vacated Barry W.'s resisting arrest conviction based on the unlawfulness of his arrest. *Id.* In both cases, the defendants were also convicted of aggravated assault on the arresting police officers.

We first addressed the defendants' convictions for resisting arrest, beginning with the premise that the "language of the statute is quite clear and unambiguous; in order to be convicted of resisting arrest, the underlying **arrest** must be lawful." *Biagini*, 655 A.2d at 497 (emphasis in original) (citing *Karl*, 476 A.2d 908). We next recognized that a "determination of the lawfulness of the underlying arrest necessitates a legal conclusion that the arresting officer acted with authority and probable cause[,]" and we adopted the Superior Court's determination that both arrests were unlawful.[27] *Id.* Consequently, we held that "as each arrest was effectuated in the absence of probable cause, one of the essential elements of the crime of resisting arrest was not established." *Id.* As such, and in line with *Karl*, we necessarily rejected the Superior Court's rationale in Biagini's case that a conviction for resisting arrest could stand on the "discharging any other duty" language of Section 5104 if they were effectuating an unlawful arrest.

---

[27] While that legal conclusion was necessary to resolving whether sufficient evidence existed, we did not state nor imply that imbedded factual determinations are irrelevant to a determination of probable cause. Probable cause determinations in both civil and criminal contexts are by their very nature mixed questions of fact and law. *See Emerson v. Cochran*, 4 A. 498, 503 (Pa. 1886) ("What constitutes probable cause is a mixed question of fact and law."). As the United States Supreme Court has explained:

> The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact[.]

*Ornelas*, 517 U.S. at 696.

Having concluded that the evidence was insufficient to establish the lawful arrest element of resisting arrest, we then turned to consider whether the defendants' convictions for aggravated assault could survive but ultimately rejected their argument that their assaults on the arresting officers were justified because their arrests were illegal. *Id.* We observed that in "a civilized society[,] rules exist to resolve disputes in an orderly and peaceful manner" and that "[p]hysical resistance to a police officer is not only counter-productive to the orderly resolution of controversy, but it is also specifically prohibited by statute." *Id.* (citing 18 Pa.C.S. § 505(b)(1)(i) (stating that the "use of force is not justifiable … to resist an arrest which the actor knows is being made by a peace officer, although the arrest is unlawful")). We stressed that a dispute about the lawfulness of an arrest "is an issue to be resolved in a courtroom, not on a street corner." *Id.* Thus, although an unlawful arrest precludes a conviction for resisting arrest, it is no bar to prosecution of other crimes committed against officers during unlawful arrests. *Id.* at 498.

We next addressed the lawful arrest element of Section 5104 in *Hock*. In that case, a police officer believed he had probable cause to arrest Hock for disorderly conduct after she insulted the officer with profanity in a normal tone of voice. *Hock*, 728 A.2d at 944. A scuffle ensued during the arrest, leading the Commonwealth to charge her with resisting arrest and disorderly conduct. *Id.* The charges were dismissed after Hock successfully litigated a pre-trial motion alleging that her arrest was unlawful. The Superior Court reversed, finding that the officer had probable cause to arrest Hock for disorderly conduct because it believed Hock's insult constituted fighting words, "and that such probable cause supplied the necessary basis for a lawful arrest so as to support the charge of resisting arrest." *Id.* at 945. We reversed the Superior Court, finding that Hock's insult did not constitute fighting words, noting that "**a trier of fact** could not reasonably find that Hock's comment risked an immediate breach of the peace." *Id.* at 947 (emphasis added).

Accordingly, we reinstated the trial court's order dismissing the charge of resisting arrest.[28]

Eight years later, in *Jackson*, we confronted a more complicated fact pattern under Section 5104. In that case, it was undisputed for purposes of our review that police lacked probable cause to arrest *Jackson* on suspicion of gambling and, thus, "the initial resistance" to his arrest "would support only assault charges, not a resisting arrest charge." *Jackson*, 924 A.2d at 620. But the officer's pursuit of Jackson was prolonged and particularly violent. Jackson fled when the police officer initially approached to arrest him. *Id.* at 619. When the officer initially caught up to him, Jackson "punched the officer in the face and chest several times and got away." *Id.* "The officer gave chase and caught [Jackson] again, but [Jackson] kneed the officer in the groin, knocking him to the ground. While the officer was down, [Jackson] tried to take the officer's gun" and, while Jackson's hands were on the gun he "threatened, 'You're done[.]'" *Id.* (citation omitted) The officer

---

[28] The Commonwealth also "vigorously advance[d]" the argument that the officer "could have lawfully arrested Hock" for failing to produce her driver's license after he gave her a "lawful command" to do so. *Hock*, 728 A.2d at 945 n.1. We did not dispute that an arrest could have occurred on that basis, however, we found that it was

> equally clear from the record that [the officer] did not intend to arrest Hock for that summary offense. He made no effort to do so[] but instead remained in his vehicle and stated that Hock would receive a citation in the mail if her privileges were suspended. It was only after Hock's epithet that the officer exited his vehicle and told her that she was under arrest for disorderly conduct. Accordingly, Hock's arrest cannot be validated by her prior refusal to produce her license.

*Id.*

Similarly, here, the Commonwealth suggests that Steadly's tinted windows and inability to produce the requested documentation are factors that gave rise to probable cause to arrest him. However, Officer Moore clearly stated at trial that the only reason he decided to arrest Steadly was because of the warrants in the MDT database. *See* N.T., 4/1/2022, at 26-27. Thus, the record before us does not support any other basis for Steadly's arrest.

eventually wrestled Jackson to the ground and was able to subdue him. *Id.* Jackson was charged and convicted of aggravated assault, simple assault, REAP, and resisting arrest; on appeal, he challenged the REAP and resisting arrest convictions on sufficiency grounds. *Id.* Applying *Biagini*, the Superior Court reversed the resisting arrest conviction because the police lacked probable cause to arrest Jackson for gambling. *Id.*

We granted review in *Jackson* to determine whether an "assault on a police officer [that] occurs as the result of the officer's attempt to unlawfully arrest him … may give rise to a lawful arrest, the resistance of which will support a charge of resisting arrest[.]" *Id.* at 619-20. The Commonwealth argued that *Biagini* compelled "the conclusion that where a defendant commits a crime during an attempted arrest, illegal for want of probable cause, that new crime allows a lawful arrest of the defendant." *Id.* at 620.

We agreed with the Commonwealth to a substantial extent. We found that while the Superior Court correctly held that Jackson's initial resistance could not support a resisting arrest charge, additional facts provided a distinct basis for probable cause to arrest. After Jackson resisted and fled and was caught again, he physically assaulted the arresting officer, giving rise to probable cause to arrest for that assault. *Id.* at 620-21. In that context, we held:

> The initial illegality does not give the arrestee a free pass to commit new offenses without responsibility. Neither does that initial illegality "poison the tree," preventing lawful police conduct thereafter—the new crimes are new trees, planted by [Jackson], and the fruit that grows from them is not automatically tainted by the initial lack of probable cause.

*Id.* at 621.

However, we did not accept the Commonwealth's framing unconditionally. Our holding was premised "on the facts" of that case: "[W]here a defendant's assault on a police officer occurs as the result of the officer's attempt to unlawfully arrest him, that assault would justify a subsequent lawful arrest, **the temporally distinct resistance** of

which will support a charge of resisting arrest under" Section 5104. *Id.* (emphasis added). We added that the plain text of Section 5104 dictates that "once a particular set of circumstances gives rise to a lawful arrest, if there is ongoing resistance that meets the defined threshold" of Section 5104, "resisting arrest is implicated on the face of" the statute. *Id.* at 621 n.2. Thus, when a "temporally distinct" assault occurs during an officer's attempt to effectuate an unlawful arrest, *Jackson* stands for the proposition that the new offense can provide independent probable cause to conduct a lawful arrest, which in turn permits a charge of resisting arrest based on conduct distinct from the initial resistance.

Importantly, *Jackson* did not state or imply that any offense committed during the resistance of an unlawful arrest will retroactively make the initial resistance sufficient to sustain a resisting arrest conviction. To the contrary, *Jackson* must be read against its facts, as our rationale in that case relied on the temporal distinction between the initial resistance and the assaults that occurred after Jackson fled when police initially tried to apprehend him unlawfully.

With this precedent in mind, we return once again to Section 5104 to further explain the contours of what constitutes a "lawful arrest" under that provision in the context of arrest and bench warrants. Heretofore, our cases addressing that element of resisting arrest have been concerned with probable cause—as developed in the field by the arresting police officers—leading up to the resistance of a warrantless arrest. Now we must consider the lawfulness of an arrest when the arresting police officer knows, at best, that a police database contains an entry for a bench or arrest warrant in the arrestee's name.

We can put certain questions to rest at the outset. First, neither party questions that police may generally arrest a person based on an existing arrest or bench warrant,

and that police often rely on police bulletins or databases rather than the physical warrants themselves when making such arrests. Second, neither party questions the constitutional guarantee that to be valid, any warrant, including a bench warrant, must establish probable cause to seize the person named.[29] *See* U.S. CONST. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

The question in this case concerns instead what evidence the Commonwealth must produce at trial to establish that a lawful arrest occurred for purposes of Section 5104 when an arrest is based **solely** on a warrant. In the Superior Court's view, sufficient evidence of the lawfulness of an arrest is established if the Commonwealth proves that the arresting police officer possessed probable cause to believe a warrant exists. Steadly, 2024 WL 660331, at *4. Omitted from that simplistic calculus is any requirement to prove that the warrant upon which the arrest was premised was itself valid. Indeed, under the Superior Court's view, the Commonwealth would never be required to prove a warrant's validity in order to prove that an arrest based on that warrant was lawful. Indeed, the bar set by the Superior Court is so low that an arrest based on a warrant could be lawful for purposes of Section 5104 if it turns out that no warrant existed at all, so long as there is evidence to show that the arresting officer had probable cause to believe it existed.

Such a standard is constitutionally untenable. The Superior Court appears to have adopted, sub silentio, an extreme version of the federal good faith exception for purposes of determining what constitutes a lawful arrest under Section 5104. "The United States

---

[29] While arrest warrants and bench warrants arise in distinct circumstances, they serve effectively the same purpose for a law enforcement official in Officer Moore's circumstances: They both authorize the officer to take into custody the person named on the face of the warrant in most circumstances. *But see supra* n.12.

Supreme Court in *Leon* made clear that, in its view, the **sole purpose** for the exclusionary rule under the 4th Amendment was to deter police misconduct." *Commonwealth v. Edmunds*, 586 A.2d 887, 897 (Pa. 1991) (citing *United States v. Leon*, 468 U.S. 897, 916 (1984)) (emphasis in original). However, "Article I, Section 8 of the Pennsylvania Constitution does not incorporate a 'good faith' exception to the exclusionary rule." *Id.* at 905-06. Furthermore, "[t]he Court in *Leon* concluded that the 4th Amendment does not mandate suppression of **illegally** seized evidence obtained pursuant to a **constitutionally defective** warrant."[30] *Id.* at 892 (emphasis added). The federal good faith exception does not pretend to retroactively render a warrant valid merely because an officer relies upon it in good faith. It simply does not permit the exclusion of evidence despite a constitutional defect in a warrant. Here, however, the Superior Court effectively used an officer's good faith belief in the existence of a warrant as the basis to assume that an arrest was lawful for purposes of Section 5104. This leads to the absurd possibility that an arrest based solely on a belief that a bench or arrest warrant existed could be lawful even if no warrant exists at all.

The Superior Court believes such an absurd conclusion was compelled by its own case law applying the collective knowledge doctrine (although it did not use that term). The collective knowledge doctrine originated in *Whiteley*[31] and was adopted by this Court

---

[30] It is of no moment that this case concerns bench or arrest warrants rather than search warrants. "This Court's consideration and rejection of the *Leon* good faith exception as a matter of state constitutional law in *Edmunds* did not turn upon the nature of the intrusion—i.e., whether a search was at issue or a seizure was at issue—but rather upon the perceived values furthered by the exclusionary rule applied under Article I, Section 8 of Pennsylvania's Constitution." *Commonwealth v. Johnson*, 86 A.3d 182, 188 (Pa. 2014).

[31] *Whiteley* was the first time the principle was expressed by the United States Supreme Court. An even earlier expression of the same concept can be found in *Williams v. United States*, 308 F.2d 326, 327 (D.C. Cir. 1962) ("When the police department possesses information which would support an arrest without a warrant in the circumstances, the (continued…)

in *Commonwealth v. Kenney*, 297 A.2d 794 (1972). The Superior cited its prior decision

*Bailey* for the proposition that:

> [A]n arresting officer in executing a valid arrest may rely on radio broadcasts emanating from police authorities in one of the following instances: 1) when he is ordered or directed to perform the arrest by an officer in possession of facts justifying the arrest, 2) when he receives information over the radio justifying the arrest, or 3) when a combination of facts heard over the radio and acquired otherwise provides requisite probable cause.

*Steadly*, 2024 WL 660331, at *3 (quoting *Bailey*, 947 A.2d at 811) (emphasis omitted).

This formulation of the collective knowledge doctrine can be traced back directly to

*Whiteley* and *Kenney*.[32]

In *Whiteley*, a Wyoming sheriff in Carbon County, acting on a tip regarding a string

of recent burglaries in Saratoga, filed a complaint charging Whiteley and Daley with

breaking and entering. *Whiteley*, 401 U.S. at 562-63. A warrant was issued for their

arrest based solely on that complaint. *Id.* at 563. The Sheriff then issued a bulletin

regarding the warrant that was conveyed over a series of police radios where it was

eventually received by an officer from the Laramie Police Department. *Id.* at 563. The

Laramie officer found Whiteley and Daley driving a vehicle identified in the bulletin and

arrested them. *Id.* A search of Whiteley's car revealed stolen goods from the Saratoga

burglaries. *Id.*

---

arresting officer, if acting under orders based on that information, need not personally or first[-]hand know all the facts.").

[32] *Bailey* quoted the above text directly from *Commonwealth v. Fromal*, 572 A.2d 711, 717 (Pa. Super. 1990), which had also relied on *Whiteley* and *Kenney*. The same language can be traced from *Fromal* back to *Commonwealth v. Reddix*, 513 A.2d 1041, 1043 (Pa. Super. 1986), which adopted the same text directly from *Commonwealth v. Evans*, 494 A.2d 383, 388 (Pa. Super. 1985). *Evans* had paraphrased *Commonwealth v. Gambit*, 418 A.2d 554, 557 (Pa. Super. 1980), which, in turn, had relied on *Kenney*.

Reviewing the legality of the arrest, the *Whiteley* Court determined that the complaint underlying the warrant merely stated the Carbon County sheriff's bald conclusion that Whiteley and Daley were responsible for the burglary, and that the complaint "alone could not support the independent judgment of a disinterested magistrate" that probable cause existed to arrest them. *Id.* at 565. The Court then considered the additional information learned by the Laramie officer leading to the arrest of Whiteley and Daley. *Id.* at 566-67. That information included the fact that the suspects and their vehicle matched the descriptions in the bulletin and the fact that Whiteley had given a false name when he was stopped. *Id.* The Court found that the "very most the additional information … tended to establish is that either [the Carbon County s]heriff … or his informant, or both of them, knew Daley and Whiteley and the kind of car they drove" but that the record was "devoid of any information at any stage of the proceeding from the time of the burglary to the event of the arrest and search that would support either the reliability of the informant or the informant's conclusion that these men were connected with the crime." *Id.* at 567. Thus, the Laramie officer's reliance on the warrant described in the bulletin did not render the arrest of Whiteley lawful.

Indeed, in *Whiteley*, the state had specifically argued that the arrest was legal because "the Laramie police relied on the radio bulletin in making the arrest, and not on [the sheriff's] unnamed informant." *Id.* at 568. The state contended that the Laramie police had "probable cause for believing that the passengers in the car were the men described in the bulletin, and, in acting on the bulletin, they reasonably assumed that whoever authorized the bulletin had probable cause to direct Whiteley's and Daley's arrest." *Id.* It believed that such a conclusion was necessary because it would "unduly hamper law enforcement" to "prevent arresting officers from acting on the assumption that fellow

officers who call upon them to make an arrest have probable cause for believing the arrestees are perpetrators of a crime[.]" *Id.*

The Supreme Court rejected that line of logic:

> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.

*Id.* It was this passage that gave birth to the collective knowledge doctrine. *See United States v. Hensley*, 469 U.S. 221, 230-31 (1985) ("This language in *Whiteley* suggests that, had the sheriff who issued the radio bulletin possessed probable cause for arrest, then the Laramie police could have properly arrested the defendant even though they were unaware of the specific facts that established probable cause.").[33]

We applied that same rationale in *Kenney* when we rejected a claim that probable cause to arrest was lacking because the arresting officer, Detective Molinari, lacked knowledge of sufficient facts to support probable cause to arrest. *See Kenney*, 297 A.2d at 796. We found that the "operative question [was] whether Lieutenant Patterson, the officer who ordered the arrest, had sufficient information to support a finding of probable cause" because "Detective Molinari was merely carrying out the order of his superior officer" and he "did not undertake on his own initiative to arrest" Kenney. *Id.* Thus, we determined that the arrest was lawful. *Id.* at 797. Importantly, Detective Molinari's arrest

---

[33] In *Hensley*, relying on *Whiteley*, the Supreme Court held that when "police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who **issued** the flyer or bulletin possessed a reasonable suspicion justifying a stop." *Hensley*, 469 U.S. at 233 (emphasis in original).

of Kenney was only deemed lawful because Lieutenant Patterson was found to possess probable cause to arrest. *See id.* at 796-97. It was not lawful because Detective Molinari reasonably believed, or had probable cause to believe, that Lieutenant Patterson possessed probable cause to arrest Kenney, logic that had been expressly rejected in *Whiteley*. It was therefore essential that the evidence of record showed that Lieutenant Patterson possessed probable cause to arrest.

In *Queen*, Officer Bryant arrived at the scene where Queen was parked and Detective Mango was investigating a robbery. *Queen*, 639 A.2d at 444. Detective Mango "approached Officer Bryant and stated that [Queen] resembled a male wanted for robbery." *Id.* Officer Bryant then ordered Queen out of the vehicle, at which point Officer Bryant observed a bulge protruding from Queen's shirt that turned out to be a firearm. Officer Bryant provided the only testimony at the suppression hearing, and suppression was denied.

The question before this Court was "whether Detective Mango's testimony was necessary to support the search" of Queen. *Id.* at 445. We concluded that his testimony "was essential" to validate whether a *Terry* stop of Queen was lawful.

> The rationale of *Whiteley* and *Hensley* clearly supports the proposition that a stop and frisk may be supported by a police radio bulletin **only** if evidence is offered at the suppression hearing establishing the articulable facts which support the reasonable suspicion. To hold otherwise would permit the government to bypass the protections of the Fourth Amendment and Article I, Section 8, of the Pennsylvania Constitution by always having a second police officer summoned for assistance for the purpose of making the inquiry of a suspect on the basis of an initial police officer's suspicion. At no time would the government have to establish any articulable facts, thus completely emasculating the protections against illegal searches and seizures.

*Id.* (emphasis in original). Consequently, we held that the suppression court erred in refusing to suppress the seized firearm. *Id.*

We most recently revisited the collective knowledge doctrine in *Yong*. There we considered whether "an investigating officer's knowledge of facts sufficient to create probable cause to arrest may be imputed to" the arresting officer "when the two officers are working as a team, but there is no evidence the investigating officer with probable cause directed the arresting officer to act." *Yong*, 177 A.3d at 877. The Superior Court had held that the collective knowledge doctrine did not apply in such circumstances, applying its view of *Whiteley* and *Hensley* to conclude that "Pennsylvania courts have never expanded the doctrine beyond the situation where a police officer who possesses probable cause instructs a fellow officer to act." *Id.* at 883 (quoting *Commonwealth v. Yong*, 120 A.3d 299, 310 (Pa. Super. 2015), *rev'd*, 177 A.3d 876). We adopted a shorthand nomenclature for these two approaches. The "vertical approach," exemplified by the circumstances in *Kenney*, describes when an officer who does not possess sufficient knowledge to establish probable cause arrests someone based upon orders or direction from another law enforcement official. *Id.* at 886. The "horizontal approach" is a broad expansion of the scope of vertical approach to the collective knowledge doctrine. *Id.* At its extreme, it involves "situations where a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause." *Id.* (quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008)). The facts in *Yong* were narrower in that the arresting officer lacked probable cause to arrest Yong, but his partner—who was not directly involved in the arrest but was part of the same investigation—did have probable cause to arrest. *See Yong*, 177 A.3d at 879-80, 887. The problem in *Yong* was that there was "no evidence the knowledge-holding officer gave a command to the officer who lacked probable cause or conveyed the information which gave rise to probable cause." *Id.* at 887. Ultimately,

we rejected the most expansive view of the horizontal approach. *Id.* at 888. However, we did adopt a "modest amplification of the vertical approach" applicable to the facts in *Yong*:

> [W]e maintain that Pennsylvania adheres to the vertical approach of the collective knowledge doctrine, which instructs that an officer with the requisite level of suspicion may direct another officer to act in his or her stead. *See Kenney*, 297 A.2d at 796. However, where, as here, the arresting officer does not have the requisite knowledge and was not directed to so act, we hold the seizure is still constitutional where the investigating officer with probable cause or reasonable suspicion was working with the officer and would have inevitably and imminently ordered that the seizure be effectuated.

*Id.* at 889-90.

In sum, under the plain language of Section 5104, a conviction for resisting arrest cannot be sustained under sufficiency review unless the underlying arrest was lawful. *Biagini*, 655 A.2d at 497. This is subject only to a narrow exception for temporally distinct resistance that gives rise to wholly distinct probable cause to arrest. *See Jackson*, 924 A.2d at 621. Furthermore, an arrest based solely on an invalid warrant is unlawful even if the arresting officer was unaware of the warrant's invalidity. *See Whiteley*, 401 U.S. at 568. If an arresting officer lacks first-hand knowledge of probable cause to arrest, he may be imputed with such knowledge under the collective knowledge doctrine if it is proven that an officer who ordered the arrest possessed probable cause to arrest. *See Yong*, 177 A.3d at 885. In circumstances where the arresting officer is acting on a reasonable belief that a warrant has been issued in the name of the arrestee and that is the sole basis upon which an arrest is made, the Commonwealth must show at a suppression hearing that the warrant was valid to prove the lawfulness of the arrest. *See Whiteley*, 401 U.S. at 568. At the trial on the charge of resisting arrest, the Commonwealth bears the burden of proof beyond a reasonable doubt that the warrant was valid in order to establish the element of lawful arrest.

With this backdrop in mind, we return to the facts of this case to determine whether Steadly's arrest was lawful. Officer Moore had no knowledge of the reasons why the bench warrants were issued in Steadly's name. Nonetheless, he reasonably believed that he was justified in arresting Steadly based on the purported existence of those warrants. These circumstances are directly analogous to the radio bulletin issued in *Whiteley*. And, as in *Whiteley*, *Hensley*, *Kenney*, and *Queen*, it was therefore essential that the Commonwealth produce evidence to allow a determination that the warrants were in fact valid.[34]

The record in this case left the Commonwealth with significant and, ultimately, insurmountable sufficiency problems. The trial court sustained Steadly's best-evidence objection to what Officer Moore personally observed in the MDT database. Accordingly, that testimony cannot establish that the warrants existed,[35] let alone that they were valid.

---

[34] Thus, we expressly disavow cases in the Superior Court insofar as they now deviate from this collective knowledge doctrine standard. For instance, *Heidelberg* held that the arresting officers' testimony that a dispatcher had confirmed that a warrant existed made it "**more probable than not** that a <u>valid</u> warrant existed." *Heidelberg*, 267 A.3d at 501 (bold emphasis in original, underlined emphasis added). As discussed above, going back to the origins of the collective knowledge doctrine in *Whiteley*, it has never been the case that evidence that a warrant exists (which justifies an officer's decision to arrest in the field), is also evidence of the warrant's validity (which is a question left for the courtroom). Thus, we reject *Heidelberg*'s holding that an officer's knowledge that a warrant exists can alone establish the warrant's validity under any standard of proof.

We leave for another day the more specific question not presented here of whether there is support for the proposition that an NCIC "report is so inherently reliable that such information is, in and of itself, sufficient to form the basis of a finding of probable cause for a police officer who receives such information from an [NCIC] report to make an on the spot arrest." *Cotton*, 740 A.2d at 264-65.

[35] Steadly suggests that the Commonwealth could have remedied that deficiency by providing documentary evidence from the MDT database to verify that a warrant in Steadly's name was entered into that system—i.e., it could have provided the best evidence of what the database said. Without any explanation, the Commonwealth did not do so. Even better evidence of the warrants' existence would be the warrants themselves. No explanation has ever been provided as to why the Commonwealth was unwilling or unable to produce the warrants at Steadly's trial.

The only admitted evidence that the bench warrants existed came from Officer Moore's subsequent testimony about the confirmation he received from the dispatcher but there was no evidence whatsoever tending to show that the warrants were valid.[36] Thus, Officer Moore was in no better position than the Laramie officer in *Whiteley* who had relied in good faith on a radio bulletin that informed him that a warrant had been issued for Whiteley. Indeed, Officer Moore was worse off than the Laramie officer. In *Whiteley*, it was undisputed that a warrant existed—that warrant and the criminal complaint upon which it was based were part of the evidentiary record that allowed the United States Supreme Court to evaluate the warrant's validity.

Proof that a warrant exists, by virtue of its appearance in a police database, is never sufficient evidence of its validity under any standard of proof. A warrant appearing in a database could be invalid at the time of arrest because it expired or because it had already been served. *See Johnson*, 86 A.3d at 327 (describing an expired warrant as "invalid"). It could be invalid because it was issued absent probable cause. *See Whiteley*, 401 U.S. at 565; *see also Edmunds*, 586 A.2d at 891 (determining that a warrant was "facially invalid" because it was issued based on "oral testimony outside the four corners of the written affidavit"). It could also be invalid if based on misstatements by the affiant even if probable cause exists on the warrant's face. *See Commonwealth v. D'Angelo*, 263 A.2d 441, 444 (Pa. 1970) (holding that although it appeared that the at-issue warrant "unquestionably" established probable cause on its face, it was nonetheless "invalid" because "the police who supplied the information knew it was not in accord with the then existing facts").

---

[36] There was also no evidence tending to show that the dispatcher had access to different information than was available to Officer Moore directly through his MDT.

We do not address today what the Commonwealth must specifically prove to establish the validity of a warrant.[37] All we can say given the record before us today is that evidence that bench warrants were entered into a police database is insufficient to show an arrest premised on such warrants was lawful.

Thus, we reject the Superior Court's conclusion that evidence that a warrant appears in a police database can provide sufficient evidence to prove the lawful arrest element of resisting arrest. Some evidence of a warrant's existence is necessary to prove that an officer is justified in effectuating an arrest that is premised solely on a warrant, but such evidence is alone insufficient to prove a warrant's validity. As we noted in *Biagini*, litigation of the lawfulness of an arrest "is an issue to be resolved in a courtroom, not on a street corner." *Biagini*, 655 A.2d at 497. On one hand, this means that citizens do not have a right to resist arrest even when they know the arrest is unlawful. On the other hand, some arrests will turn out to be unlawful when the arresting officer does not personally possess knowledge of the facts and circumstances upon which the warrant was issued.

No evidence was presented to show that Officer Moore or the dispatcher had first-hand knowledge of the warrants' validity and the collective knowledge doctrine did not

---

[37] We observe that when reviewing the Commonwealth's evidence of guilt under sufficiency review, "the facts and circumstances need not be absolutely incompatible with [a] defendant's innocence." *Commonwealth v. Sullivan*, 371 A.2d 468, 478 (Pa. 1977); *see also Commonwealth v. Libonati*, 31 A.2d 95, 97 (Pa. 1943) ("The requirement of the law is that in order to warrant a conviction the facts and circumstances proved must be of such character as to produce a moral certainty of the guilt of the accused beyond any reasonable doubt—not that they need be absolutely incompatible with his innocence—and that doubt is for the jury unless the evidence be so weak and inconclusive that as matter of law no probability of fact can be drawn from the combined circumstance.") (citations and quotation marks omitted). We hold today only that some evidence of a warrant's validity must be presented at trial to enable the court or jury to determine if an arrest based on such a warrant is lawful. Only in future cases—wherein some evidence of validity is proffered—will we be able to provide further guidance as to what sufficient evidence of a warrant's validity looks like.

apply because the Commonwealth did not provide any other evidence of the warrants' validity. The panel below erred by relying on *Bailey*'s misstatement of the collective knowledge doctrine and *Heidelberg*'s faulty rationale (although it did not directly cite *Heidelberg*). The Superior Court also relied on *Blakney*, but *Blakney* should have guided the Superior Court to the opposite conclusion in this case.

In *Blakney*, Detective Martin obtained an arrest warrant for Blakney, but the arrest "was actually made by another officer, Ferriola[,]" who knew only that the warrant existed, but did not know the facts that led Detective Martin to obtain a warrant. *Blakney*, 396 A.2d at 6. The *Blakney* court held that Detective Martin did not possess adequate probable cause when he obtained the warrant. *Id.* at 7. *Blakney* correctly stated that the validity of the arrest was not affected by the fact that Officer Ferriola "had knowledge of the arrest warrant[] but did not have physical possession of it at the time." *Id.* Critically, in the very next sentence of that opinion, the court stated: "However, the fatal flaw here is the lack of probable cause for the issuance of the arrest warrant." *Id.* (citing *Kenney*, 297 A.2d 794). The Superior Court panel in this case omitted this second sentence when quoting from *Blakney*.[38] *Steadly*, 2024 WL 660331, at *3. *Blakney* correctly held that the collective knowledge doctrine did not apply. Because **the arrest was deemed unlawful**,[39] the *Blakney* court reversed Blakney's judgment of sentence because the only evidence used against him was found in a search incident to that unlawful arrest. *Id.*

Most of our precedent on the validity of warrants and the collective knowledge doctrine arises, of course, in the context of suppression where such issues are typically

---

[38] The *Heidelberg* court made the very same mistake when citing *Blakney*. *See Heidelberg*, 267 A.3d at 501.

[39] The court made clear that the invalidity of the arrest warrant rendered the arrest unlawful. *See Blakney*, 396 A.2d at 7 ("**Had the arrest been lawful**, the subsequent search of the defendant and the area within his immediate control would have been lawful as incident to a lawful arrest.") (emphasis added).

litigated. On that basis, the Commonwealth attempts to distinguish much of the precedent discussed above based on the procedural distinction between suppression and trial. And, indeed, the resisting arrest statute is somewhat unique. Elements of criminal offenses are typically questions of fact. Resisting arrest is different as it incorporates a mixed question of law and fact as an element of an offense because the lawfulness of an arrest turns on a determination of the validity of the warrant. This uncommon circumstance may (or may not) be an important distinction in future cases addressing the lawful arrest element of resisting arrest, but it matters not at all on the record before us today.

In the circumstances of this case, the distinction between suppression and trial can only weigh against the Commonwealth and the Superior Court's decision because the Commonwealth's burden at trial is substantially higher than it is at suppression. Indeed, this Court has at times defined the test for probable cause by distinguishing it from the higher burden required at trial. *See Commonwealth v. Dickerson*, 364 A.2d 677, 681 (Pa. 1976) (stating that the test for probable cause "is not one of certainties but rather one of probabilities" that is "not equivalent to the 'proof beyond a reasonable doubt' standard applied at trial"). Consequently, proof at trial can never be less than is required for purposes of suppression and, because the Commonwealth failed to prove the validity of the warrants, it would have failed to prove the lawfulness of Steadly's arrest at suppression. If the Commonwealth could not meet its burden at suppression, it necessarily cannot meet its higher burden at trial. Here, governing case law demonstrates that Officer Moore's good faith belief in the existence of bench warrants for Steadly is insufficient to prove the lawfulness of the arrest at suppression. Accordingly, the same evidence could never meet the sufficiency standard at trial.[40] Section 5104

---

[40] We reject the Commonwealth's additional argument that the burden to prove the lawfulness of an arrest based on a warrant is somehow an insurmountable burden at trial because, at suppression, a defendant has the initial burden to identify why he or she (continued…)

requires the Commonwealth to prove a lawful arrest occurred.  When an arrest is premised solely on the appearance of a warrant in a police database, such evidence can never constitute proof of that element beyond a reasonable doubt.

**Conclusion**

To prove the lawful arrest element of resisting arrest where the resisted arrest is premised on an arrest or bench warrant, the Commonwealth must produce evidence of the validity of a warrant beyond its mere existence.  Because the Commonwealth failed to produce any evidence of the warrants' validity in this case, the evidence was insufficient to sustain Steadly's conviction for resisting arrest.  Accordingly, we reverse the decision of the Superior Court, reverse Steadly's conviction for resisting arrest, and vacate his judgment of sentence.

Chief Justice Todd and Justices Dougherty, Wecht, Brobson and McCaffery join the opinion.

Justice Dougherty files concurring opinion in which Justice McCaffery joins.

Justice Mundy files a dissenting opinion.

---

believes a warrant is invalid.  *See* Pa.R.Crim.P. 581(D) (stating that a defendant's suppression motion "shall state specifically and with particularity the evidence sought to be suppressed, the grounds for suppression, and the facts and events in support thereof").  A criminal defendant has no such burden at trial.  To the contrary, the United States Constitution establishes the Commonwealth's burden at trial.  *See Patterson v. New York*, 432 U.S. 197, 210 (1977) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged.").  Consequently, a defendant only has a burden at trial to prove an affirmative defense.  *See Commonwealth v. Mouzon*, 53 A.3d 738, 743 (Pa. 2012) (stating that "federal due process permits States to place a burden on the defendant to prove an affirmative defense by a preponderance of the evidence, so long as the defendant is not thereby required to negate an element of the offense").  We decline the Commonwealth's invitation to flip its constitutionally mandated burden at trial because it believes that burden is difficult.